*Formatted for Electronic Distribution*                                                                                              *Not for Publication*

Filed & Entered
On Docket
March 16, 2012

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

| | |
|---|---|
| In re:<br>    Patricia Jo Braine,<br>               Debtor. | Chapter 7 Case<br># 10-10391 |
| Patricia Jo Braine,<br>        Plaintiff,<br>v.<br>Educational Credit<br>Management Corporation,<br>        Defendant. | Adversary Proceeding<br># 10-1026 |
| *Appearances:*   David W. Lynch, Esq.<br>                       *Colchester, Vermont*<br>                       *For the Plaintiff* | Gary L. Franklin, Esq.<br>*Burlington, Vermont*<br>*For the Defendant* |

### MEMORANDUM OF DECISION
#### DENYING MOTION TO RECONSIDER AND GRANTING JUDGMENT IN FAVOR OF THE PLAINTIFF

Patricia Jo Braine (the "Plaintiff") initiated the instant adversary proceeding against the holder of her student loans for a determination of whether those loans could be discharged in bankruptcy pursuant to 11 U.S.C. § 523(a)(8).[1] For the reasons set forth below, the Court determines the Plaintiff has met her burden under the test enunciated by the Second Circuit in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987) governing dischargeability of student loans, and therefore grants judgment in favor of the Plaintiff.

#### JURISDICTION

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and declares it to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

#### PROCEDURAL AND FACTUAL BACKGROUND

The Plaintiff filed a voluntary Chapter 7 petition on March 24, 2010 (# 10-10391, doc. # 1). On July 12, 2010, the Plaintiff filed a complaint initiating this adversary proceeding (doc. # 1)[2] to determine

---

[1] All statutory citations refer to Title 11 of the United States Code (the "Bankruptcy Code"), unless otherwise indicated.

[2] All document numbers refer to the instant adversary proceeding, AP # 10-1026, unless otherwise indicated.

1

the dischargeability of her student loan debts.³ On July 13, 2010, the Court entered an order discharging the Plaintiff (# 10-10391, doc. # 11).

On July 29, 2011, the Plaintiff and Educational Credit Management Corporation (the "Defendant") filed a joint pre-trial statement stipulating to the following facts as of that date:

1. The Plaintiff was born on March 20, 1946.
2. The Plaintiff is single and resides in Burlington, Vermont.
3. The Plaintiff received a bankruptcy discharge on July 13, 2010, discharging debts in the amount of approximately $102,458.
4. The Plaintiff is currently self-employed as a photographer and videographer.
5. Prior to her work as a photographer and videographer, the Plaintiff worked for Burlington Public Works as a crossing guard until February 2010, earning approximately $25 per day.
6. The Plaintiff is on a Supplemental Security Income Plan to Achieve Self Support ("PASS") to become a photographer and videographer, under which:
    a. the Plaintiff receives $728 per month in SSI income and $688 per month in SSDI income;
    b. through PASS, the Plaintiff is able to set aside her monthly SSDI income to purchase or save for approved work-related items and services;
    c. the Plaintiff's SSDI income is not to be used for living expenses;
    d. the Plaintiff's PASS benefit is scheduled to run through November 2011; and
    e. should the Plaintiff's PASS benefit not be renewed, she will maintain $728 per month in SSI income.
7. The Plaintiff also receives $200 per month in food stamp benefits and has the benefit of a Section 8 housing subsidy that reduces her rent to $78 per month.
8. The Plaintiff's adjusted gross income was approximately $1,285 in 2008, -$2,216 in 2009, and -$1,622 in 2010.
9. The Plaintiff hopes to earn more income in 2011.
10. The Plaintiff obtained student loans from 1988 through 2005, for the following studies:
    a. the Plaintiff attended Antioch University between 1988 and 1998;
    b. the Plaintiff attended Burlington College from 1990 to 1993;
    c. the Plaintiff earned a B.A. in communications from Burlington College; and
    d. the Plaintiff completed coursework toward a master's degree at Antioch in 1998 and at St.

---

³ The Plaintiff originally filed the complaint against Vermont Student Assistance Corporation (see doc. # 1). On September 9, 2010, the Court entered an order substituting Educational Credit Management Corporation as party defendant (doc. # 10).

  Michael's between 2003 and 2005.

11.  The Plaintiff did not complete her master's degree in education.
12.  In February 2007, the Plaintiff consolidated her student loans by executing a consolidated note with Vermont Student Assistance Corporation in the amount of $53,343.65 (the "Note").
13.  The Plaintiff deferred payments on the Note.
14.  Until the time the Plaintiff filed for bankruptcy, she never defaulted on her student loan payment obligation.
15.  The Defendant is the guarantor of the debt and the current holder of the Note.
16.  Interest continues to accrue under the Note at the rate of 4.625% per annum.
17.  As of July 28, 2010, the outstanding balance on the Note was $61,873.69.

(doc. # 27, pp. 2–3; see also doc. # 35).

  On October 20, 2011, the Court held an evidentiary hearing, at which the Plaintiff and Heather Diederich, D.C., the Plaintiff's treating chiropractor, testified. On October 26, 2011, the Plaintiff filed a motion to reconsider the Court's ruling at the evidentiary hearing excluding certain testimony of Dr. Diederich (doc. # 40), which the Defendant opposed (doc. # 41). The Court has taken the Plaintiff's complaint and motion for reconsideration under advisement.

## DISCUSSION

### The Plaintiff's Motion to Reconsider

  At the evidentiary hearing, the Plaintiff moved that Dr. Diederich be allowed to testify as an expert witness. The Defendant objected on the basis that Dr. Diederich was not called to testify as, or disclosed as, an expert. The Plaintiff's attorney conceded that he did not disclose Dr. Diederich as an expert witness, but moved that she be recognized as an expert witness on the basis that she testified sufficiently as to her education, years of practice, and scope of knowledge to qualify as an expert. The Court sustained the Defendant's objection and denied the Plaintiff's motion based upon the Plaintiff's failure to identify and disclose Dr. Diederich as an expert prior to trial as required by the Federal Rules of Civil Procedure.

  The Plaintiff seeks reconsideration on the basis that, after review of the discovery record, the Plaintiff believes she adequately disclosed Dr. Diederich's anticipated testimony as a witness pursuant to Federal Rule of Civil Procedure 26(a)(2)(A) (doc. # 40). The Defendant opposes the motion to reconsider, arguing that the Plaintiff is seeking to relitigate an issue already decided, and nothing in the motion to reconsider contradicts the fact that the Plaintiff did not identify Dr. Diederich as an expert under Rule 26(a)(2)(A) or provide the required disclosures under Rule 26(a)(2)(C) (doc. # 41).

3

The standard for granting a motion for reconsideration is strict. "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." Id. "A 'motion for reconsideration may not be used to plug gaps in an original argument or to argue in the alternative once a decision has been made.'" Archibald v. City of Hartford, 274 F.R.D. 371, 382 (D. Conn. 2011) (quoting Horsehead Res. Dev. Co., Inc. v. B.U.S. Envtl. Servs., Inc., 928 F.Supp. 287, 289 (S.D.N.Y. 1996). "A motion to reconsider should not give the moving party another bite at the apple by permitting argument on issues that could have been or should have been raised prior on the original motion." In re Bird, 222 B.R. 229, 235 (Bankr. S.D.N.Y. 1998) (citing Fed. Deposit Ins. Corp. v. Meyer, 781 F.2d 1260, 1268 (7th Cir. 1986)). Reconsideration of an earlier decision may be justified when a party can point to "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992), cert. denied, 506 U.S. 820 (1992) (citation and quotation omitted). "However, 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason [be] permitted, to battle for it again.'" Id. (citing Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir. 1964), cert. denied, 377 U.S. 934 (1964)). "A motion to reconsider is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved." Davey v. Dolan, 496 F. Supp. 2d 387, 389 (S.D.N.Y. 2007) (citation and quotation omitted). Ultimately the question is a discretionary one and the court may reconsider its own decisions any time prior to final judgment. Virgin Atl. Airways, Ltd., 956 F.2d at 1255.

Federal Rule of Civil Procedure 26 provides, in relevant part:

(a)    Required Disclosures.

. . .

    (2)    *Disclosure of Expert Testimony.*

        (A)    In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

. . .

        (C)    Witnesses Who Do Not Provide a Written Report. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

4

> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii) a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2)(A), (C) (emphasis in original). Federal Rules of Evidence 702, 703, and 705 address expert witness testimony. See Fed. R. Evid. 702, 703, 705.

The Plaintiff identified Dr. Diederich only as a witness in her Rule 26(a) initial disclosures, which state, in relevant part:

> Heather L. Diederich D.C. . . . Burlington, VT. Dr. Diederich has knowledge of Ms. Braine's physical health, disabilities, and limitations on her ability to work.

(doc. # 40-1). The disclosure does not identify Dr. Diederich as an expert witness, indicate that she will be presenting opinion testimony, or provide a summary of any opinions to which she is expected to testify as an expert witness. See Fed. R. Civ. P. 26(a)(2)(A), (C). The Plaintiff has not identified any new evidence or any change in controlling law warranting reconsideration of this Court's previous ruling. Accordingly, the Plaintiff's motion to reconsider is denied.

### **The Non-Dischargeability Complaint**

Section 523(a)(8) of the Bankruptcy Code provides, in relevant part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>
> (A)
>
> (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit . . . .

11 U.S.C. § 523(a)(8)(A)(i). A student loan will not be discharged unless the debtor "affirmatively secures a hardship determination." Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 450 (2004).

In the Brunner case, the Second Circuit announced the standard for "undue hardship" that this Court must apply for a debtor to have student loans discharged as an undue hardship. The standard requires the debtor to establish that:

A) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

B) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

C) the debtor has made good faith efforts to repay the loans.

5

Brunner, 831 F.2d at 396. It is the debtor's burden to prove each of the three prongs of the Brunner test. Lehman v. New York Higher Educ. Servs. Corp. (In re Lehman), 226 B.R. 805, 808 (Bankr. D. Vt. 1998) (Conrad, J.). If the debtor cannot satisfy each prong of the Brunner test, he or she is not entitled to discharge the student loan. Williams v. New York State Higher Educ. Serv. Corp. (In re Williams), 296 B.R. 298, 302 (S.D.N.Y. 2003) (quoting Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d Cir. 1995)); see also Thoms v. Educ. Credit Mgmt. Corp. (In re Thoms), 257 B.R. 144, 148 (Bankr. S.D.N.Y. 2001); Lehman, 226 B.R. at 808. The debtor must prove his or her case by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 287 (1991); see also Maulin v. Salliemae (In re Maulin), 190 B.R. 153, 157 (Bankr. W.D.N.Y. 1995).

### A. The "Minimal Standard" Prong

To prove the "minimal standard" prong of the Brunner test, the Plaintiff must show that she cannot, based upon her current income and expenses, both maintain a "minimal" standard of living and repay her student loans.

At the October 20, 2011 trial, the Plaintiff testified that she currently receives social security benefits of approximately $726 per month, as well as benefits for a work incentive program. A letter from the Social Security Administration (the "SSA") dated February 7, 2011, which was admitted into evidence as part of the Plaintiff's Exhibit D, indicates that the Plaintiff is on a Supplemental Security Income Plan to Achieve Self Support ("PASS"), for which she receives SSDI income of $688, of which $668 may only be used for work-related items and services (Pl.'s Ex. D, p. 2). The letter further indicates that the Plaintiff receives SSI income of $726.04, which she may use for living expenses together with the remaining $20 of SSDI income (Pl.'s Ex. D, p. 2). The Plaintiff testified that, pursuant to the rules, she uses her PASS income for car insurance, mileage, office supplies, marketing, building a web site, advertising, and developing her business. The Plaintiff further testified that her PASS benefit would expire in November 2011, unless she reapplied, in which event it would expire in March 2012.

The Plaintiff's Current Income Schedule as of October 2011, which was admitted into evidence as part of the Plaintiff's Exhibit E, reflects that as of that time the Plaintiff had regular monthly income from employment in the amount of $181, social security income in the amount of $688 per month, and food assistance income in the amount of $200 per month, for a total monthly income of $1,069 (Pl.'s Ex. E, p. 1).[4] The Plaintiff conceded that her Current Income Schedule should have listed $726.04 plus $20 of social security income, i.e., $746.20, for personal use, rather than $688.00. This correction would yield a

---

[4] Although the Plaintiff testified that the $181 per month in regular monthly income was an approximation and an average throughout the year for her photography work for the City of Burlington Department of Parks and Recreation, the Defendant did not challenge the Plaintiff's representation that she earns $181 per month from this source of income.

6

current total monthly income of $1,127.04.

On the expense side, the Plaintiff's Current Expenses Schedule as of October 2011, which was admitted into evidence as part of the Plaintiff's Exhibit E, reflects that as of that time the Plaintiff had expenses of $78 for rent, $131 for electricity and heating fuel, $50 for telephone, $50 for internet, $250 for food, $15 for laundry and dry cleaning, $220 for medical and dental expenses, $92 for transportation, and $156 for auto insurance, for total monthly expenses in the amount of $1,042 (Pl.'s Ex. E, p. 2).  At trial, in response to questions from Defendant's counsel, the Plaintiff conceded that the $50 telephone, $50 internet, and $156 auto insurance expenses are business expenses, rather than personal expenses, and therefore should not have been included.  This would result in a corrected figure of $786 for the Plaintiff's total expenses, and of $341.04 for the Plaintiff's net monthly income.

The Plaintiff testified that of the $220 in medical and dental expenses, $150 is for supplements to maintain her health, including calcium, vitamin D, vitamin E, fish oil, a supplement for stress, a supplement for pain, and an unspecified health powder.  The Plaintiff testified that she learned about using the supplements from a health care professional, and that she saw a nutritionist before she began to begin using these supplements.  The Plaintiff's business bank account history, which was admitted into evidence as the Defendant's Exhibit J, indicates that the Plaintiff purchased health powder for $69.75 on March 3, 2011 (Def.'s Ex. J, p. 25).  The Plaintiff testified that she took the health powder every month to supplement her food intake, and that she also obtained approval from her PASS benefit counselor to sell the health powder, through which she hoped to recoup some of its cost, although that had not panned out yet.  The Defendant argues that the Plaintiff's expenses should be reduced by $150 because the supplements are not medically necessary.  However, the Court finds the Defendant's argument to be unpersuasive, as the Defendant elicited no testimony contradicting the Plaintiff's statements or supporting its position with respect to the medicinal value of the supplements.

Information about the Plaintiff's consolidated loan, which was admitted into evidence as part of the Plaintiff's Exhibit B, indicates that the Plaintiff's monthly loan payment is $607 (Pl.'s Ex. B, p. 17). There is nothing in the record indicating that the Plaintiff's student loan payment has changed since that document was issued, and the Defendant did not elicit or present any testimony disputing this monthly loan payment amount.  Since the Plaintiff's monthly student loan payment of $607 exceeds her net monthly income of $341.04 per month by $265.96, she is unable, based upon her current income and expenses, to both pay her student loan payment and maintain a minimal standard of living.[5]  Therefore,

---

[5] Even if the Court were to accept the Defendant's argument and reduce the Plaintiff's expenses by the $150 allocated to the supplements, the Plaintiff's monthly student loan payment would still exceed her monthly income by $115.96.

7

the Plaintiff has satisfied the "minimal standard" prong of the Brunner test.

### B. The "Future Prospects" Prong

The second Brunner prong requires the Debtor to establish by a preponderance of the evidence that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans," or, stated another way, "[r]equiring evidence not only of current inability to pay but of additional, exceptional circumstances, strongly suggestive of continuing inability to pay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.'" Brunner, 831 F.2d at 396. "Additional, exceptional circumstances" have been described as circumstances where "the debtor experienced an illness, developed a disability, or became responsible for a large number of dependents after receiving the [student] loan." Thoms, 257 B.R. at 149; see also Kelsey v. Great Lakes Higher Educ. Corp. (In re Kelsey), 287 B.R. 132, 142, 144 (Bankr. D. Vt. 2001). This Court has found that the second prong has been met where the debtor exhibited a combination of low income and exceptional circumstances so severe that the debtor would not have been able to repay the loans. See King v. Vt. Student Assistance Corp. (In re King), 368 B.R. 358, 370–73 (Bankr. D. Vt. 2007); see also Kelsey, 287 B.R. at 143–44.

The Plaintiff's primary health ailments relate to her back as described by Dr. Diederich. She is currently self-employed as a photographer and videographer. She previously worked for Burlington Public Works as a crossing guard until February 2010 (see Procedural and Factual Background ¶¶ 4–5, supra). At trial, the Plaintiff testified that she can no longer work as a crossing guard because she had several falls, and that she can no longer work as a videographer because she lacks the strength to carry the required camera equipment. She testified that in recent years she worked mainly at physical labor jobs because she had minimal administrative skills and had trouble retaining administrative jobs, but physical labor employers stopped hiring her because she complained of back pain when asked to do work requiring significant exertion. The Plaintiff further testified that she has not gotten a job as property manager since leaving St. Michael's and can no longer do that work either. She previously worked at City Hall but can no longer work there because it requires too much lifting. And, though she contemplated returning to Los Angeles to work as a production assistant, she cannot afford to move and cannot work in that role either due to the lifting involved in that line of work.

The Plaintiff testified that her feet also caused her to have difficulty with certain types of employment. She was born with a foot deformity, and then broke four bones in her foot in 2002. The broken bones did not heal properly because she was unable to afford medical treatment. Though she had

had some balance issues prior to breaking her foot, the improper healing of the broken bones exacerbated her balance difficulties. She further testified that she applied for social security disability benefits in the fall of 2006 because of both the back pain and problems with her broken foot, and was found to be eligible in 2007. She began receiving her PASS benefit in 2008. There was no dispute that the PASS benefits would end in November 2011, unless she reapplies, in which case her PASS benefit could be extended until March 2012, when she turns 66 years old.[6]

The Plaintiff also testified as to another medical issue: she had surgery to remove a cancerous tumor in April 2010, and developed a hernia as a result.

Heather Diederich, D.C., the Plaintiff's treating chiropractor, testified that she had been treating the Plaintiff for almost two years, and that she had diagnosed the Plaintiff with subluxation of the lumbar spine, osteoarthritis of the lumbar spine, and lumbalgia. She further testified that the Plaintiff's arthritic condition was a permanent condition that generally becomes progressively worse. Dr. Diederich testified that the Plaintiff's condition had a significant impact on her ability to work, and based upon her observations when the Plaintiff had worked certain jobs in the past, she had been extremely uncomfortable for days or weeks after. She further testified that she was aware the Plaintiff had fallen several times over the last year, and testified that the Plaintiff's foot deformity and arthritis of the lumbar spine contribute to the Plaintiff having a less accurate sense of balance and make the Plaintiff more likely to fall. Dr. Diederich also testified that the Plaintiff could not stand consecutively for more than two hours at a time, although this depended on circumstances such as whether the Plaintiff was working every day or one day per week. Dr. Diederich discouraged heavy lifting, and gave the example that she believed the Plaintiff could lift a 40-pound object one time, but could not do so repetitively.

Dr. Diederich further testified that, as a photographer, the Plaintiff would be limited in how much she could work. She testified that, given the history of what she observed in her office, the number of times the Plaintiff has had acute exacerbations of her chronic back condition, and knowing how long the duration of symptoms last every time she has had one, it is hard to imagine that the Plaintiff could continue a full-time job year-round. A letter written by Dr. Diederich on May 26, 2011, which was admitted into evidence as part of the Plaintiff's Exhibit A, includes the following prognosis:

> Due to the chronic nature of Mrs. Patricia Braine's low back condition, I believe that she will, by definition, experience chronic back pain. While Patricia has permanent degenerative changes in her lumbar spine, she does seem able to affect pain levels, mobility, and alignment with chiropractic care and exercise. Yoga and physical

---

[6] Although the Plaintiff testified that her $50 telephone, $50 internet, and $156 auto insurance expenses are business expenses cove red by her PASS benefit, it is unclear from her testimony how the $256 in expenses would be paid for after her PASS benefit expires.

9

>    therapy/swimming seems to have had the greatest benefit in strengthening her low back and affording stability to her "fragile" nature. **Given the physical nature of her career (carrying heavy equipment, squatting, prolonged standing, etc.), it is unlikely that Patricia will be able to maintain a full-time job. Even with part-time work, the risk of injury is high.** I would strongly suggest she continue with chiropractic care (2x/mo) and exercise (2-5x/wk) such that she maintains a stronger, flexible, aligned spine. Hopefully, then she will be able to enjoy both work and play.

(Pl.'s Ex. A, p. 1) (emphasis added). Dr. Diederich testified that her letter referred to the Plaintiff's career as a photographer and videographer, but if the Plaintiff were to do physically demanding work in property management, it would be similar to videography and she would expect the Plaintiff to likely have the same difficulty.

The Plaintiff and her treating chiropractor testified credibly and persuasively about the Plaintiff's significant and debilitating chronic medical conditions that have impeded and continue to impede her ability to work. The Defendant argues that the Plaintiff failed to take sufficient steps to obtain employment, and failed to search for non-physical jobs or jobs outside of Vermont. The Court finds this argument to be unpersuasive. It finds the Plaintiff credibly testified that she was unable to retain the non-physical jobs she obtained due to her lack of administrative skills, and she could not afford to move out of state for employment. Based on the evidence presented at trial, the Court finds that the Plaintiff has demonstrated additional exceptional circumstances that strongly suggest her current inability to repay her student loans will continue over an extended period of time. Accordingly, the Plaintiff has satisfied the "future prospects" prong of the Brunner test.

### C. The "Good Faith" Prong

The final prong of the Brunner test requires a debtor to show that he or she has "made good faith efforts to repay the loans," Brunner, 831 F.2d at 396, and is measured by the debtor's "efforts to obtain employment, maximize income, and minimize expenses." O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn), 339 F.3d 559, 564 (7th Cir. 2003). Many courts of appeal have held that a debtor's "effort to seek out loan consolidation options that make the debt less onerous is an important component of the good-faith inquiry," as it "illustrates that the debtor takes her loan obligations seriously, and is doing her utmost to repay them despite her unfortunate circumstances." Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour), 433 F.3d 393, 402 (4th Cir. 2005) (citing Alderete v. Educ. Credit Mgmt Corp. (In re Alderete), 412 F.3d 1200, 1206 (10th Cir. 2005); Tirch v. Pennsylvania Higher Educ. Assistance Agency (In re Tirch), 409 F.3d 677, 682–83 (6th Cir. 2005)). This represents an indicia of good faith, but it is not a per se requirement, see Cota v. United States Dep't of Educ. (In re Cota), 298 B.R 408, 420 (Bankr. D. Ariz. 2003). This Court does not deem it mandatory for a debtor to seek out loan consolidation options as

10

a prerequisite to seeking a discharge of student loans, but rather looks to the totality of the circumstances to determine if the debtor made a good faith effort to obtain employment, maximize income, and minimize expenses.

The Plaintiff obtained student loans from 1988 through 2005. She attended Antioch University between 1988 and 1998; attended Burlington College from 1990 to 1993, earning a B.A. in communications; and completed coursework toward a master's degree at Antioch in 1998 and at St. Michael's between 2003 and 2005 (see Procedural and Factual Background ¶ 10, supra). The Plaintiff did not complete her master's degree in education (see Procedural and Factual Background ¶ 11, supra). At the hearing, the Plaintiff testified that, in order to graduate from St. Michael's, she would have had to take nine additional credits at a cost of approximately $18,000, which she could not afford.

In February 2007, the Plaintiff consolidated her student loans (see Procedural and Factual Background ¶ 12, supra). Although the Plaintiff deferred payments on the Note, she never defaulted on her student loan obligation pre-petition (see Procedural and Factual Background ¶¶ 13–14, supra). The Plaintiff testified that since consolidating her loans in 2007, the loans were mostly in deferment or forbearance, and she had conscientiously worked to manage her student loan debt so as to avoid going into default. She testified that she had understood that student loan forgiveness might be available if she worked for a non-profit, and she described how she endeavored to set up a non-profit aimed at working with at-risk youth as an alternate means of satisfying her student loan debt. The Plaintiff testified that in 1990, she met with the financial director at Burlington College to discuss her options for loan repayment and loan forgiveness, and left thinking that she had viable possibilities for retiring her student loan debt. However, she subsequently learned that loan forgiveness for educators in at-risk areas was no longer an option.

The Plaintiff anticipated completing the masters program at St. Michael's in the spring of 2006, when she would have been 59 years old, and her plan had been to make enough money to accelerate payment of her student loan if she could. She testified credibly that she had always intended to repay the loans, and she knew there was a possibility that she would be obligated to make student loan payments well into her later years. She testified she first started seeing a chiropractor in 2002 for back pain, but did not know at the time that she had a chronic medical condition. The Plaintiff further testified that although she continued to experience back pain while attending school at St. Michael's between 2003 and 2005, the pain was only intermittent at the time and did not significantly impair her ability to work. She testified that she became concerned about her ability to repay her loans in school when she began having difficulty balancing work and school responsibilities. She was also worried that without a master's degree she

11

would not be able to pay back her loans. However, she wanted to work, was willing to do any job she felt qualified to do, and was persuaded that if she kept trying she would find a way to earn enough to repay the student loans. The Plaintiff further testified that when she started her business plan as a videographer and photographer, her intention was to build a business so she could employ others to help her. However, this intention never came to fruition because her physical ailments prevented her from being able to do the lifting required for videography assignments, and she could not train others if she was unable to do the work herself.

A letter from the Defendant's attorney dated July 19, 2011, that was admitted into evidence as the Defendant's Exhibit L, describes the various repayment options available to the Plaintiff; it includes income based, income contingent, standard, graduated, and extended repayment programs (Def.'s Ex. L). The Plaintiff testified that she received this letter in the summer of 2011. Under these repayment programs, the letter projects the Plaintiff's estimated monthly payments would be between $0 and $347.69, ultimately determined by the Plaintiff's adjusted gross income and adjustments and increases based on various terms (Def.'s Ex. L). The Plaintiff testified that she knew nothing about the availability of the various repayment programs until she received this letter, post-petition.

The record in this case, especially the Plaintiff's very credible testimony, establishes the following points with respect to the good faith prong of the Brunner test: the Plaintiff diligently attempted to repay her loans by working many kinds of jobs; she explored all employment options for which she was qualified and had the requisite skills; she suffers from medical conditions that challenge her ability to work in the areas for which she is best qualified; she has valiantly tried to overcome these challenges and been conscientious about taking steps to alleviate her most serious symptoms in order to find gainful employment; she tried to develop a professional position as a videographer to fund her monthly loan debt service and put her in a position to hire employees to whom she could shift the physical demands of the work she could not handle; she made all reasonable efforts to maximize income and minimize expenses; she began the process of creating a non-profit entity to work for at risk youth in Burlington as a means of both generating income to repay her loans and qualifying for loan forgiveness programs; she applied for and obtained social security disability and PASS benefits to help her advance her career opportunities and improve her budget; she opted to leave St. Michael's before finishing her master's degree rather than incur an additional $18,000 in student loans that she was worried she would not be able to repay; she consolidated her student loans in 2007 (see Procedural and Factual Background ¶ 12, supra); and she faithfully requested deferments and forbearances whenever needed to avoid defaulting on her student loans.

The Defendant argues that the Plaintiff failed to take serious affirmative steps to repay her loan beyond requesting deferments and forbearances. The Court finds the Defendant's argument to be unpersuasive in light of the Plaintiff's credible testimony regarding her various efforts to obtain employment, maximize her income, and minimize her expenses. The Plaintiff has, by a preponderance of the evidence, established the "good faith" prong of the <u>Brunner</u> test.

## **CONCLUSION**

For the reasons set forth above, the Court (1) denies the Plaintiff's motion to reconsider the Court's ruling excluding certain testimony of the Plaintiff's treating chiropractor; (2) finds the Plaintiff has satisfied the criteria required by the <u>Brunner</u> test; (3) finds the Plaintiff has proved by a preponderance of the evidence that compelling her to repay her student loans would impose an undue hardship upon her; and (4) declares the Plaintiff's student loans to the Defendant to be discharged pursuant to § 523(a)(8). The Court will enter an order granting judgment in favor of the Plaintiff.

This memorandum constitutes the Court's findings of fact and conclusions of law.

March 16, 2012  
Burlington, Vermont

Colleen A. Brown  
United States Bankruptcy Judge

13